NORTHCUTT, Chief Judge.
F.B. has never personally seen his daughter, Z.L., who was born in 1998, but the whys and wherefores are not revealed in the record. In the absence of additional evidence, the circuit court erred in terminating F.B.’s parental rights. Accordingly, we reverse and remand for further proceedings.
We note initially that, as conceded by both the Department of Children and Family Services and the Guardian ad Li-tem Program, the court’s termination order is legally insufficient because it contains only a conclusory statement that termination of F.B.’s parental rights would be in the manifest best interests of the child. See S.P. v. State, Dep’t of Children & Families, 751 So.2d 667 (Fla. 2d DCA 2000) (reversing when final judgment terminating parental rights failed to address statutory factors concerning manifest best interests of child); see also § 39.809(5), Fla. Stat. (2007) (requiring judge to enter written order with findings of fact and conclusions of law). For this reason alone, we would reverse.
But we must also reverse based on insufficient evidence. Z.L. is one of several half-siblings who were sheltered in 2006. The parental rights of the children’s mother were terminated in 2007. The children now live in the home of Z.L.’s step-grandparents, who would like to adopt them. The child does not know her father, and he admits that he has never seen her in person.
The case worker testified that she sent certified letters to F.B. when the child was sheltered. The letters were mailed to three different Michigan addresses that were discovered in the case worker’s search for the child’s father. Although someone signed for the letters, F.B. never responded.
In December 2007, the case worker again wrote to F.B., this time addressing the letter to a federal penitentiary. F.B. responded quickly, stating that this was the first time anyone had contacted him about the child and expressing interest in taking care of Z.L. He did not want his parental rights terminated. F.B. said that he had only seen pictures of the child and that he had never questioned his paternity because she looked just like him. He also said that he had tried to obtain the mother’s address in the past but her relatives would not give it to him. F.B. asked for the child’s address so he could write to her. He also asked for information about the status of his case. Presumably because termination proceedings were already underway, the case worker apparently never responded.
*686 At the final hearing some four months later, F.B. was represented by counsel and appeared by telephone. He testified that he first learned the child was dependent in December 2007 (when he received the letter in prison), and he denied receiving anything before then. He admitted that he had never seen the child. Notably, however, the Department failed to introduce any evidence to show when F.B. first learned of his child, what he had been doing in the intervening years, or whether he had been able to provide for the child.
At the Department’s request, the court did take judicial notice “of this file, in particular the shelter documents, ... all the orders, the final judgment adjudicating the child dependent as to [F.B.], the case plan as to [F.B.], [and] the various orders.” The file contained an assessment of the child in which the mother was reported to have said that F.B. refused to acknowledge paternity when she got pregnant and they parted ways: “He went to jail, I moved back to Florida, and we haven’t been in touch since.” F.B.’s attorney did not make any hearsay objections to the documents encompassed within the request for judicial notice. After hearing evidence of F.B.’s lack of contact with Z.L., the court granted the petition and ruled that F.B. had abandoned the child.
Under the statutory definition, abandonment occurs when a parent, “while being able, makes no provision for the child’s support and makes no effort to communicate with the child, which situation is sufficient to evince a willful rejection of parental obligations.” § 39.01(1). The Department is required to prove its case with clear and convincing evidence, § 39.809(1), because “[n]atural parents have a fundamental liberty interest in the care, custody, and management of their children.” In re C.W.W., 788 So.2d 1020, 1023 (Fla. 2d DCA 2001). In this case, however, the Department failed to show by clear and convincing evidence that F.B. was able but failed to provide for the child.
[C]lear and convincing evidence [has been defined] as an “intermediate level of proof [that] entails both a qualitative and quantitative standard. The evidence must be credible; the memories of the witnesses must be clear and without confusion; and the sum total of the evidence must be of sufficient weight to convince the trier of fact without hesitancy.”
In re Adoption of Baby E.A.W., 658 So.2d 961, 967 (Fla.1995) (quoting in part In re Davey, 645 So.2d 398, 404 (Fla.1994)).
The evidence in this case reflects that F.B. responded immediately when the Department contacted him directly. His letter, which was introduced into evidence, stated that his past attempts to locate the mother were fruitless. The mother did not appear in the proceedings against F.B. Her statement recounted in the assessment suggested that F.B. walked away from the child at birth, but this statement was hearsay. See S.P., 751 So.2d at 669 (noting trial court’s possible reliance on inadmissible hearsay and directing court on remand to consider only admissible evidence). And it was rebutted by F.B.’s evidence that he had never denied paternity and that he had tried without success to locate the mother. Furthermore, there was no evidence to show that F.B. was ever able to provide financial support. Although his attorney suggested that he began his latest incarceration in 2005, the mother’s statement suggested that he might have been incarcerated earlier. We can only conclude that the Department failed to introduce clear and convincing evidence of abandonment. See J.T. v. Dep’t of Children & Family Servs., 819 So.2d 270 (Fla. 2d DCA 2002) (concluding that abandonment was not shown when *687 father did not know about child for first three years of life and thereafter experienced difficulties maintaining contact due to his incarceration); see also T.C.S. v. State, Dep’t of Health & Rehabilitative Servs., 647 So.2d 1025 (Fla. 4th DCA 1994) (reversing finding of abandonment when incarcerated parent made futile attempts to establish communication with Department and baby).
The Department may indeed be able to establish abandonment with clear and convincing evidence that F.B. knew of his child, was able to support her or at least to communicate with her and assume some parental duties, and yet made only marginal efforts to do so. See In re R.V.F., 437 So.2d 713 (Fla. 2d DCA 1983) (concluding that father abandoned child when he did not contact child or Department for more than seventeen months and provided no support although he had the financial ability to do so). However, the evidence presented heretofore was insufficient to do so.
Reversed and remanded for further proceedings.
STRINGER and KHOUZAM, JJ., concur.